Excuse me, Mr. Picotta, would you begin your argument? Yes, your honors. If I please the court, Mr. Kelderman. This is a conviction in an arson case that occurred back in April 8, 2015. It involves a trailer house that was owned by a woman by the name of Christy Pierce. Her son was in the trailer house. This occurred in Kyle, in a rural area on the Pine Ridge Indian Reservation. On September 14, 2017, it went to trial. There were two counts, one on an arson that allegedly occurred on April 6, and another one on about April 8. The first charge was dismissed, and Mr. Ferguson was convicted on the second charge. Just a little about the facts to give you a little overview. It's alleged that there was bad blood between the Pierce's and the Ferguson's. That Pierce had a trailer that they were living in that shouldn't have been there. That Danny Ferguson rode up on a motorcycle, put a burning blanket under the trailer. Mr. Rios came out, put the fire out. There wasn't any damage to the trailer, and there was no injury to any persons, although there were people in the trailer at the time. He was convicted. Now, the first issue that I want to talk about is whether or not Mr. Ferguson was deprived of his attorney. The players in this case are FBI agent Michelle Bruce, and there was a DCI agent Goebel, and then Mr. Ferguson and Mr. Ferguson's wife, Dolores, and John Witt, who was a tribal advocate. FBI agent Bruce goes out and talks to Danny Ferguson on April 29th, and he denies everything. Then she says, well, why don't you come and take a polygraph? They set up a polygraph on May 15th at the police station there in Pine Ridge, South Dakota, the tribal police station. Bruce and Goebel were there. Danny Ferguson, John Witt, his attorney, and Dolores, his wife, were there. They told Michelle Bruce that they wanted John Witt there because Danny had, as Dolores said, his wife, she testified at trial that Danny had a brain injury. He can't handle pressure. They wanted to make sure that John Witt was with him, so they hired him to represent Mr. Ferguson in this case. John Witt told him that he was representing Mr. Ferguson in this case. He said that he wanted to be present to be with Mr. Ferguson at his questioning. When they took Mr. Ferguson back to the polygraph room, Mr. Witt was there with him. Of course, Mr. Goebel said, there's not enough. First of all, you can't be present when I'm asking the questions. Michelle Bruce says there's only room for two people in the polygraph room. This is Chief Judge Smith. Let me ask you a couple of directed questions to focus in on what I see as our first principal issue. That is, when he went down for the polygraph examination, what is there in the record to show that he was actually in custody at the time they began to ask questions? Is it in the record or what is the evidence that Mr. Ferguson requested the presence of Mr. Witt once the questioning had begun? Well, Your Honor, I will say, first of all, you have to realize in this case, Dewey Ernst testified that Danny had a learning disability, had had an IEP since the first grade. He had a brain injury in the year 2000. He had difficulties with verbal communication. He functioned at a fifth and sixth grade level, at about an 11 or 12 year old level. And he had a major cognitive disorder. So in answer to your question, Judge, he was not in custody. But here's the overriding thing in this case. Danny and his wife both told Michelle Bruce that they wanted Mr. Witt present. My answer to your question is, first of all, I do not believe that custody is required to be deprived of your right to an attorney. In this case, Danny and his wife wanted Mr. Witt present. Bruce knew that Mr. Witt had been hired. Witt told him that he wanted to be present. When he went back to the polygraph room, they said, no, we're just going to ask the question. So he left. He told both Google and Bruce that he was retained. They basically didn't tell him after he flunked the exam. When they were through with the interrogation of the polygraph, Mr. Ferguson went outside. And then Bruce went in and talked to Google. Google says, bring Danny back in. I'm going to tell him that he flunked the polygraph. They didn't tell Mr. Witt that they were going to interrogate him. They told him that they would not interrogate him. They were just going to ask him the questions. I've read excerpts of the transcript of the interrogation. And I was just curious, was there a time in there where Mr. Ferguson asked for the presence of Mr. Witt or some other legal counsel? And that he was determined that he was done with answering questions? He did not ask for an attorney during that questioning, Your Honor. He did say that he was through talking. He went back. They asked him about what had happened. He made a number of admissions. Consequently, they used those admissions. And to be quite frank with you, if they didn't have those admissions, there would have never been a conviction in this case, I don't believe. I'm sure Mr. Kelderman has a contrary view on that. Mr. Goble testified. The polygraph examiner, he said that the reason that they didn't tell Mr. Witt that they were going to interrogate him was because he was not a licensed attorney in this case. He was a tribal advocate. And that's another issue in this case. And Mr. Goble, if you read his testimony, he said, look, if Mr. Witt was a licensed attorney, it would have been over. We would have not tried to interrogate him because no attorney would have allowed him to do that. And had he been a licensed attorney, he wouldn't even have tried to interrogate him. But he went ahead and did it in this case because Mr. Witt was only a tribal advocate. So is there authority out there that you can point to that says basically you can have a lay person with you and that's the equivalent of asking for an attorney? I mean, as I understand it, Mr. Witt had no legal training whatsoever. Well, he was licensed. Go ahead. I'm sorry to interrupt you, Judge. Go ahead. The only thing I would say is he's licensed to practice in tribal court. He's been practicing for years down there. He attended college. He did some COEs. He represented people in criminal cases for years down there. He testified that he would have advised him not to answer the questions. And as far as the precedent here as to whether or not his wishes should have been honored in this case, I mean, we have U.S. v. Long on the Eighth Circuit. This is a U.S. v. First. It's a Ninth Circuit case. And there's a U.S. v. Eastman. I think we all, both Mr. Kellerman and I, discussed those in our case. Mr. Picardo? Yes. As I recall, the questioning was interrupted, or at least there were intermissions for at least a couple of different occasions, as I recall, for bathroom breaks or a respite for Mr. Ferguson. And during that time, he did actually confer with Mr. Witt and someone else, I think, who was present with him. Was he ever given – did he make any indication to Mr. Witt at that time that he wished to cease the questioning or wanted Mr. Witt to intercede or intervene in his behalf? There's no testimony of that, Your Honor, in the case. When he came out the first time, they took him back. He came out the first time, and he said, I didn't want to go through it just because I didn't do it. And then Michelle, the FBI agent, said, well, the one way you can prove it, you can finish the polygraph. Mr. Witt says, go ahead, John, or go ahead, Danny. Do the polygraph because it's not admissible in court anyway. And so he went back in and finished the polygraph. That was the extent. And then after he finished it, he came back out, and he just talked to John, and he talked to his wife, and then they asked him to come back in. That's when they should have told Mr. Witt that they were going to interrogate him. And had they told him that, there would have been no more questioning. He would have said, no, we're over. We came here to do the polygraph. We did the polygraph. That's all that's going to happen here. So we have a situation here. As far as talking about John Witt, we have a case where we're only in the investigative stage. There were no formal charges yet. Both tribal and federal court had jurisdiction over the case. The tribal police were involved in this investigation as well as the FBI. And consequently, it was not proper for the FBI or Mr. Global to ignore Mr. Ferguson's right to have the attorney present. Everyone knew that Witt had been hired in this case. The excuses that were used were... to the appellant here during these breaks? I mean, did they tell him, don't go back in, let's leave, you don't have to talk? There was no testimony of that, Judge Shepard. Couldn't they have done that? I mean, he was not in custody. You started off your argument by conceding that he was not in custody, but his opportunity to confer with those people was not interfered with, was it? They could have given him whatever advice they wanted. I'm sure that they could have, except that this man was a very unintelligent, dull, probably borderline mentally defective person. I know that I argued in my brief too, Your Honor, that the record in this case, while we don't think that custody was required to be shown, that there are facts that would support the fact that he was deprived of this custody, given his mental capacity in this case, Your Honor. Thank you. Thank you, Mr. Picotto. Thank you, Mr. Picotto. Mr. Kelderman? Good morning, Your Honors. May it please the court and counsel, I'm Eric Kelderman, representing the United States in this appeal. The United States requests that the court affirm Danny Ferguson's conviction in all respects. The fundamental issue, I guess, as Chief Judge Smith pointed out or asked about moments ago, is whether the defendant here was in custody when he was interviewed, when he was at the Justice Center in Pine Ridge for the polygraph. Everything about facts surrounding this case, everything about those interviews, shows that he was not in custody. Mr. Ferguson drove there on his own or arrived there with his wife, met with Mr. Witt while he was there. When he went into the room with Special Agent Jeff Goble from the South Dakota Division of Criminal Investigation, he was advised in that room that he was there voluntarily. He was shown a polygraph form. He was told that he had a right to refuse the polygraph. He had a right to decline to answer any questions, that he did not have to be there, that the statements that he makes or made could be used against him, that he could consult with an attorney. Largely, Miranda warnings, but they're separate and they're on a form that the DCI and a lot of law enforcement agencies use before polygraphs are initiated. Mr. Kilderman, having that kind of information on a form with a person with mental limitations is little comfort. Is there some sense here of perhaps the investigators taking advantage of the questionee's limited intelligence in how the questions were asked and how the interrogation was continued and even for the purposes of the interrogation they were up front and that this might not be admissible, this wasn't admissible, but how clear was it to him that his admissions statements against his interests would be things that could ultimately lead to his prosecution and conviction? Your Honor, he was advised, I'll address those questions I guess in two ways. First of all, he was advised and the polygraph advice form, Special Agent Goble read it to him. At Mr. Ferguson's request, he asked for it to be read and Special Agent Goble read it to him, asked him if he understood. I submit that when the court, if it hasn't done so, if the court listens to the recordings, the recordings make it abundantly clear that the defendant understood what was going on. It was a part of the trial that there was some testimony about mental deficiencies. Special Agent Goble was very careful. It's a long process with some polygraphers before they actually get to the questions to have a conversation, to get background information about a defendant. It sets the stage for understanding the state of mind of an individual who's being interviewed and here, there was a long period of just conversation between Special Agent Goble and Mr. Ferguson. The court has those available, certainly, and they show... What was the length of the entire questioning period, including the breaks? The entirety of the period took... 20 minutes. It took a number of hours. I think it was over two hours for the whole time period that the defendant was there until he terminated the final interview. The actual questions after the polygraph were not nearly as long. I can't remember the exact time, but I think it may have been under 30 minutes. Once the polygraph actually began, the defendant, Mr. Ferguson, actually stopped the interview at one point, stopped the polygraph, and walked out of the room. He went to talk to Mr. Witt and to his wife. He was seen talking to them. Special Agent Cruz asked him if he would come back to finish it. He came back. Special Agent Goble, then, was in the room with him. On the recording, it shows that Special Agent Goble clearly asked him questions, asked Ferguson questions about whether he wanted to be there, whether he wanted to terminate it, whether he wanted to continue. The defendant said, Mr. Ferguson said, he did want to continue. He had to use the bathroom. That he was nervous. They continued after Special Agent Goble cleared that up with him. It continued. Then, at some point, when they got to questions specifically about the fire at the Pierce residence or the arson, the defendant, again, left the room. He left the room and stopped the interview at that, stopped the polygraph. At that point, Special Agent Goble made a, I guess he looked at the questions, looked at what he had accomplished, what he had gotten through with Mr. Ferguson. At that point, he decided he had enough information to be finished with the polygraph. He and Special Agent Cruz then informed Ferguson that they'd like to talk to him about the results. The defendant went back in and they did. They had every intention of doing an interview. They brought him back in. They told him that he had been deceptive or that it indicated deception. Then, they proceeded to interview him with regard to the allegations and about the facts of it. The conversation went on for, I guess, quite a while. I don't know, more than a half an hour. At some point, Mr. Ferguson said, I don't want to talk about that. Arguably, something that, if it were a custodial situation, he would have been, I guess, invoking his right to remain silent. He said, I don't want to talk about that. Special Agent Goble paused and stopped right there. He asked, okay, now, do you want to talk to us or do you not? Because what Mr. Ferguson would do is he would talk about or discuss, make comments not wanting to talk, but then he would continue talking. When he did that, he continued to talk. Special Agent Goble clarified with him, do you want to stop? Do you want to keep talking to us? Because it's voluntary and I just want to make sure that you're willing to continue to talk. He did. Then, the questioning got a little more specific, a little bit more directed toward the arson. When it did, at some point, I guess, obviously, at the end of the interview, he said, I want to plead the fifth, I believe. At that point, the agent said, okay, we're going to finish this interview. We're going to terminate the interview. When he did, the recordings show everything about this was voluntary, that the defendant knew exactly what was going on. He used the opportunity to avail himself of the rights that the agents had told him about, that he could leave at any time. He did it, really, essentially three times, two times during the polygraph, and then at the end, it showed he knew what he was doing. He went and he talked to Mr. Witt. I believe it is correct that the record doesn't show exactly what was told him or what he told Mr. Witt or his wife when he was out in the entry at the Justice Center there, but he returned. Mr. Kilderman? Yes. Just hypothetically, if that incriminating evidence from his statements during the questioning were excluded, what other evidence is left in the record to establish that he committed the offense charged? Your Honor, there were the testimony of Sam Rios and Kristi Pierce. I'll try to just summarize quickly. Ms. Pierce testified that she saw the defendant, Mr. Ferguson, drive onto her yard near her trailer house on a motorcycle. Saw him for about five seconds driving. Then next thing that she knew, they heard the wall of their home vibrating. Mr. Rios was there also. He saw the defendant, I believe, drive up on a motorcycle and then felt the vibration, saw the vibration on the wall of the home. He went outside and he looked and he saw Mr. Ferguson stuffing a blanket under the trailer and lighting it on fire. He went out there and he yelled at the defendant. The defendant, Mr. Ferguson, kept his face away from him in an effort, I guess, as it appeared in the context of the trial to hide his face, hide himself from being seen. But the blanket was lit. There was scorching of the walls of the trailer home. There was accelerant found on the blanket, on the burnt blanket, and that was admitted as an exhibit at the trial as well. I guess the willfulness is shown by the fact that a person would stuff a blanket and light it on fire under a trailer home. There were people inside the residence, obviously, and they even came outside and confronted him or attempted to before he drove away on the motorcycle. The elements are met in that there is a fire set to a residence where people lived. The setting of the fire puts lives in jeopardy, meeting that element as well. I do have the elements laid out, set forth in my brief. Their testimony, if believed, and it did come down to a credibility determination by the jury, I believe, but that is for the jury to consider. The defense put on a number of alibi witnesses, witnesses who said the defendant was with them during this time of the day, witnesses who said that his motorcycles weren't running. But the jury heard all of that evidence. The jury made its credibility determination, and that should be upheld. In other news, the court has decided in the Mullenbrook case, Chief Judge Smith, that was a case where you sat on the panel. In the Mullenbrook case, the defendant, in a non-custodial setting, requested an interview, or I'm sorry, requested to speak to an attorney. This court held, and this is on 634 F. 3rd at page 997. Because the right to counsel was not indicated, the court held, we need not address Mullenbrook's additional argument that officers denied his allegedly unambiguous request for counsel during the interview. The custodial situation, custody is what's required. Custody and interrogation are what are required in order for the defendant to have a right to counsel, a right to remain silent to invoke. Here, he was not in custody, and therefore, any alleged invocation, any request or desire by Mr. Witt to be there, was essentially ineffective or of no moment. The United States requests, therefore, that the court affirm Ferguson's convictions in all respects. Thank you, Mr. Kelderman. Mr. Picotti, you used all of your time in your opening, but fortunately, Mr. Kelderman had a minute left on his time, so if you've got a reply that you'd like to, and some information you'd like to conclude with before the court, please, we'll give you a minute to conclude. I think the record is clear that everybody knew that Danny Ferguson wanted Mr. Witt to be present. Groves, Goble admitted that Groves had excuses on why she didn't take him back there. I think that the right to an attorney can be exercised by those, especially when you have a mentally defective person, it can be undertaken by those that are representing him, especially his wife and Mr. Witt, in this case, the tribal advocate. Nothing further, Your Honor. Thank you, Mr. Picotti. Thank you also, Mr. Kelderman. The court appreciates counsel's presence before the court this morning, even though it's virtual. It, I think, is nonetheless effective, and I'm glad that we were able to have the opportunity to converse with you all on the issues in the case. We'll take the case under advisement and bring the decision as promptly as possible. Thank you both. You may be excused.